Hari Santhanam (*pro hac vice* forthcoming)
HSanthanam@perkinscoie.com
PERKINS COIE LLP
110 North Wacker Drive, Suite 3400
Chicago, IL 60606-1511
Tel: 312.324.8400 / Fax: 312.324.9400

Nicole S. Dunham (*pro hac vice* forthcoming)
NDunham@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Tel: 206.359.8000 / Fax: 206.359.9000

Lori Gordon (*pro hac vice* forthcoming)
LoriGordon@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, DC 20005-3960
Tel: 202.654.6200 / Fax: 202.654.6211

Lara J. Dueppen, SBN 259075
LDueppen@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Tel: 310.788.9900 / Fax: 310.788.3399

*Attorneys for Plaintiff Brius Technologies, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIUS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SWIFT HEALTH SYSTEMS INC. d/b/a/ INBRACE and UNIVERSITY OF SOUTHERN CALIFORNIA, <br><br> Defendants. | Case No. 8:22-cv-01770 <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT OF NONINFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Brius Technologies, Inc. ("Plaintiff" or "Brius"), by and through its attorneys, alleges for its Complaint against Defendant Swift Health Systems Inc. d/b/a/ InBrace "InBrace") and the University of Southern California ("USC") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1. Brius brings this action for a declaratory judgment of noninfringement of the U.S. Patent No. 11,129,696 ("the '696 patent"), arising under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. A true and correct copy of the '696 patent is attached hereto as Exhibit 1. Brius seeks this relief because InBrace purports to possess certain rights under the '696 patent by virtue of a license from USC and has wrongly alleged that Brius infringes the '696 patent. Brius denies that it has infringed, or infringes, any properly construed claim of the '696 patent. In addition to directly accusing Brius of infringement, on information and belief, InBrace has represented to others, including orthodontists and customers, that Brius is infringing InBrace's patent rights. Brius, thus, brings this action to remove the cloud of uncertainty that InBrace's allegations have imposed on Brius' business.

2. The face of the '696 patent identifies USC as the owner by assignment of the '696 patent. On information and belief, InBrace has a contractual relationship with USC and/or serves as USC's agent for purposes of commercializing and enforcing the '696 patent.

## THE PARTIES

3. Brius is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2611 Westgrove Drive, Suite 109, Carrollton, Texas, 75006. Brius is a leading provider of innovative orthodontic technology, including its Independent Mover® technology, which provides teeth straightening solutions that are efficient and aesthetic.

4. On information and belief, InBrace is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business

at 111 Academy Drive, Suite 150, Irvine, California 92617. InBrace purports to have certain rights under the '696 patent by virtue of a license from USC. On information and belief, InBrace has a contractual relationship with USC and/or serves as USC's agent for purposes of commercializing and enforcing the '696 patent.

5. On information and belief, USC is a corporation organized and existing under the laws of the State of California, with its principal place of business at 3551 Trousdale Parkway, ADM 352, Los Angeles, California 90089. USC is listed as the owner by assignment of the '696 patent. (Ex. 1 at cover.)

6. On information and belief, InBrace and USC together possess all substantial rights under the '696 patents. Joinder of these parties is appropriate under Rules 19 and/or 20 of the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and further under 28 U.S.C. §§ 1331 and 1338(a) because this action involves claims arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

8. This Court has general personal jurisdiction over InBrace at least because (1) InBrace maintains a principal place of business in Irvine, California within this District, and (2) InBrace has had continuous and systematic business contacts with the State of California and this District. On information and belief, InBrace has been registered to do business in the State of California since 2014 and employs over 150 individuals at its Irvine, California location. This Court also has specific personal jurisdiction over InBrace because InBrace has engaged in enforcement activities relating to the '696 patent in and from California and this District, including for example through communications from its CEO.

9. This Court has general personal jurisdiction over USC at least because (1) USC is incorporated in California, (2) USC has its principal place of business in Los Angeles, California within this District, and (3) USC has had continuous and

systematic business contacts with the State of California and this District. On information and belief, USC employs over 28,000 faculty, staff, and student workers, a large portion of whom are employed in the State of California and within this District, and further enrolls over 49,000 undergraduate, graduate, and professional students in the State of California and within this District. (*See* https://about.usc.edu/facts/.)

10. Venue in this District is proper under 28 USC §§ 1391(b) and (c) at least because a substantial part of the events or omissions giving rise to Brius' claims occurred in this District and because each of Defendants is subject to personal jurisdiction in this District such that they reside in this District.

11. An actual, immediate, and justiciable controversy exists between Brius and Defendants regarding the noninfringement of the '696 patent. InBrace purports to possess certain rights under the '696 patent by virtue of a license from USC and has asserted that Brius infringes this patent. Brius denies that it infringes, or has infringed, any properly construed claim of the '696 patent.

12. The controversy is immediate and substantial as reflected by the parties' escalating communications regarding alleged infringement by Brius. Within months after the '696 patent issued, InBrace communicated to Brius personnel that it believed Brius was infringing certain InBrace patents, though InBrace did not specifically identify which patents it believed to be infringed.

13. On or about May 4, 2022, InBrace's CEO emailed Brius' then-CEO and vice president of sales, stating InBrace's belief that Brius' "product designs that have appeared on various social channels . . . are covered by several InBrace patents," though he did not specify which patents those were. The email further attached a presentation including a slide that purported to compare InBrace's product with several examples of Brius' products incorporating Independent Mover® technology. A true and correct copy of the slide is attached hereto as Exhibit 2. Consistent with the email, the slide stated: "On social media and at clinical presentations, Brius team-

members have been showing product iterations that we believe are covered by Several [sic] InBrace patents."

14. On or about August 19, 2022, InBrace's CEO again emailed Brius' then-CEO and vice president of sales, and attached another presentation referencing alleged infringement by Brius. A true and correct copy of the presentation is attached hereto as Exhibit 3. In the presentation, InBrace again pointed to several examples of Brius' products incorporating Independent Mover® technology and specifically identified the '696 patent. Given the context of the parties' earlier communications, it was apparent from the presentation that InBrace was accusing Brius of infringing the '696 patent.

15. In August 2022, Brius appointed an interim CEO. On or about September 26, 2022, Brius' interim CEO had a telephone conference with InBrace's CEO to discuss InBrace's infringement allegations and the August 19, 2022 presentation. During the telephone conference, InBrace's CEO confirmed that it was InBrace's position that Brius was infringing the referenced '696 patent and potentially other unidentified patents. Underscoring the immediacy of the matter, InBrace's CEO indicated that enforcement would be inevitable.

16. On information and belief, InBrace has represented, and continues to represent, to customers that Brius is infringing the '696 patent.

## FACTUAL BACKGROUND

### Brius' Independent Mover® Technology

17. A common objective in orthodontics is to correct teeth misalignment (malocclusion) by using devices referred to as "braces" to reposition teeth to a more functional or aesthetically pleasing location. Typically, braces employ an archwire—a thin, flexible wire—placed along a patient's dental arch and secured to brackets that are fixed to the front of the patient's teeth. Archwires for orthodontic applications are available as precut arch-shaped wires or spools of wire that can be further shaped. The shape and stiffness of the archwire as well as the archwire-

bracket interaction, in turn, govern the forces applied to the teeth and thus the direction and degree of tooth movement.

18. To exert a desired force on a patient's teeth, an orthodontist will manually incorporate bends in the archwire when initially placing and securing it to the patient's teeth. The movement of any one tooth, however, can cause unintentional movement of other nearby teeth. Through regular appointments, the orthodontist will visually assess the progress of the treatment and make manual adjustments to the archwire, or replace or reposition the brackets. The adjustment process can be time consuming and tedious for the patient, and often results in patient discomfort for several days following an appointment.

19. Eschewing archwires altogether, Brius developed an innovative orthodontic treatment system that uses "Independent Movers®" positioned on the back (lingual) side of the teeth to efficiently and effectively treat all ranges of malocclusions. This technology allows an orthodontist to manipulate a 3D virtual model of the patient's teeth to develop a treatment plan that is then used to create a custom-designed set of Independent Movers®.

20. Unlike archwires, Brius' Independent Movers® are formed from sheets of nickel titanium (NiTi) alloy and include structures of varying shapes and cross-sections, such as arms, bends, ribbons, and bars—all designed and pre-programmed to move each tooth independently to its final, desired location. An example of Brius' Independent Movers® is shown below:



(https://brius.com/orthodontists/.)

21. Brius' Independent Mover® technology advantageously minimizes the unwanted movement of teeth, providing for a more efficient treatment that reduces the number of office visits, patient discomfort, and overall treatment time.

22. Underscoring the innovative nature of the Independent Mover® technology, Brius has applied for and obtained numerous patents covering aspects of this technology, including U.S. Patent Nos. 10,383,707, 10,905,527, 10,993,785, and 10,980,614.

## The '696 Patent

23. The '696 patent is entitled "Orthodontic appliance with snap fitted, non-sliding archwire" and "relates to orthodontic appliances, including archwires and associated orthodontic brackets." (Ex. 1 at title, 1:22-23.)

24. The '696 patent issued from U.S. Patent Application No. 16/292,126, filed on March 4, 2019 ("'126 application") and purports to claim priority to U.S. Patent Application No. 15/249,198, U.S. Patent Application No. 14/067,690, and U.S. Provisional Patent Application No. 61/720,263 (collectively "priority applications"). (Ex. 1 at cover.)

25. Independent claim 1 of the '696 patent recites:

> 1. A custom archform configured to follow a dental arch segment, the custom archform comprising:
>
> a plurality of bracket connectors, each bracket connector of the plurality of bracket connectors corresponding to an individual tooth of the dental arch segment such that the plurality of bracket connectors respectively correspond to each and every tooth of the dental arch segment,
>
> a plurality of interproximal segments, each interproximal segment of the plurality of interproximal segments corresponding to each and every interdental space of the dental arch segment, wherein each interproximal segment of the plurality of interproximal segments is interspersed between a pair of bracket connectors of the plurality of bracket connectors,

wherein the archform defines a longitudinal axis and wherein each interproximal segment comprises a first point on the longitudinal axis, a second point on the longitudinal axis, and an interproximal loop between the first point and the second point, the interproximal loop comprising a first portion configured to extend in a gingival direction away from the first point and a second portion configured to extend in an occlusal direction to the second point thereby defining a gap along the longitudinal axis between the first and second points that provides an unobstructed opening configured to face in the occlusal direction to within the interproximal loop without extending on an occlusal side of the longitudinal axis; and

wherein the archform comprises a custom memorized shape that is configured to move teeth of the dental arch segment from an initial configuration to a digitally pre-determined expected alignment obtained using image data of the patient's teeth by forces imparted by the archform on respective orthodontic brackets after the plurality of bracket connectors are locked to respective orthodontic brackets disposed on teeth of the dental arch segment.

26. Independent claim 19 of the '696 patent recites:

19. A custom archform configured to fit within a human mouth and follow a dental arch segment, the custom archform comprising:

a plurality of bracket connectors, each bracket connector of the plurality of bracket connectors corresponding to an individual tooth of the dental arch segment such that the plurality of bracket connectors correspond to each and every tooth of the dental arch segment that is to be manipulated by the custom archform,

a plurality of interproximal segments, each interproximal segment of the plurality of interproximal segments corresponding to each and every interdental space between teeth of the dental arch segment, wherein each interproximal segment of the plurality of interproximal segments comprises an interproximal loop,

wherein an interproximal segment of the plurality of interproximal segments is interspersed between each adjacent pair of bracket connectors of the plurality of bracket connectors,

wherein the archform defines a longitudinal axis and wherein the interproximal loop comprises a first point on the longitudinal axis, a second point on the longitudinal axis, and a curve extending away from the longitudinal axis in a gingival direction between the first point and the second point, without extending on an occlusal side of the longitudinal axis, to define

-7-

        a gap along the longitudinal axis that is open in an occlusal direction to facilitate flossing,

        wherein the archform comprises a customized shape a digitally pre-determined expected alignment of the teeth, obtained using image date of the patient's teeth an expected alignment of the teeth, the customized shape configured to move teeth of the dental arch segment from an initial configuration towards the expected alignment by forces imparted by the archform on orthodontic brackets disposed on teeth of the dental segment; and

        wherein when the plurality of bracket connectors are locked in respective orthodontic brackets, at least a portion of the archform is configured to deflect, thereby transferring forces to the teeth of the dental archform and causing orthodontic tooth movement.

27. As set forth in independent claims 1 and 19, all of the claims of the '696 patent require an "archform."

28. A true and correct copy of the '126 application (that issued as the '696 patent) as filed is attached as Exhibit 4.

29. The term "archform" did not appear in the '126 application as filed. (*See generally* Ex. 4.)

30. The term "archform" did not appear in any of the '696 patent's priority applications as filed.

31. During the prosecution of the '126 application, the applicants submitted a preliminary amendment dated July 31, 2020. A true and correct copy of the July 31, 2020 preliminary amendment is attached as Exhibit 5.

32. It was in the July 31, 2020 preliminary amendment that the applicants first proposed any claims including the term "archform" during the prosecution of the '126 patent.

33. In the July 31, 2020 preliminary amendment, the applicants canceled all of the then-pending claims that recited the term "archwire" and added new claims that recited the term "archform." (*Compare* Ex. 4 at 31-36 (claims reciting "archwire"), *with* Ex. 5 at 2-5 (newly added claims reciting "archform").)

34. In the July 31, 2020 preliminary amendment, the applicants represented that "no new matter ha[d] been added" but did not identify any support in the specification of the '126 application for the term "archform." (Ex. 5 at 6.)

35. During the prosecution of the '126 application, the applicants submitted another preliminary amendment dated October 13, 2020. A true and correct copy of the October 13, 2020 preliminary amendment is attached as Exhibit 6.

36. In the October 13, 2020 preliminary amendment, the applicants again canceled the then-pending claims and added new claims reciting the term "archform." (Ex. 6.)

37. In the October 13, 2020 preliminary amendment, the applicants again represented that "no new matter ha[d] been added" but did not identify any support in the specification of the '126 application for the term "archform." (Ex. 6 at 6.)

38. During the prosecution of the '126 application, the Examiner issued a notice of allowability dated August 23, 2021 containing an Examiner's amendment to the specification. A true and correct copy of the notice of allowability containing the Examiner's amendment is attached as Exhibit 7.

39. The Examiner noted that authorization for the amendment was provided by the applicants' prosecution counsel and amended paragraph [0043] of the '126 application as follows:

**IN THE SPECIFICATION:**

AT [0043] of the originally filed specification, LINE 4, after "interproximal loops by the archwire legs 103." INSERT –The archform 101 may define a longitudinal axis. The interproximal segments of the archform 101 may include a first point on the longitudinal axis, a second point on the longitudinal axis, and an interproximal loop 105 between the first and second points. The interproximal loop 105 can include a first portion configured to extend in a gingival direction away from the first point and a second portion configured to extend in an occlusal direction to the second point. The interproximal loop 105 can define a gap along the longitudinal axis between the first and second points that provides an unobstructed opening configured to face in the occlusal direction, the unobstructed opening providing access into the interproximal loop 105. The archform 101 can include an interproximal loop 105

> extending away from the longitudinal axis in a gingival direction between the first and second points, without extending on an occlusal side of the longitudinal axis, to define a gap along the longitudinal axis that is open in an occlusal direction to facilitate flossing.–

(Ex. 7 at 3-4.)

40. The amendment to paragraph [0043] of the '126 application is reflected in the issued '696 patent on column 7, lines 10-28, hereinafter referred to as the "archform" passage:

> The archform 101 may define a longitudinal axis. The interproximal segments of the archform 101 may include a first point on the longitudinal axis, a second point on the longitudinal axis, and an interproximal loop 105 between the first and second points. The interproximal loop 105 can include a first portion configured to extend in a gingival direction away from the first point and a second portion configured to extend in an occlusal direction to the second point. The interproximal loop 105 can define a gap along the longitudinal axis between the first and second points that provides an unobstructed opening configured to face in the occlusal direction, the unobstructed opening providing access into the interproximal loop 105. The archform 101 can include an interproximal loop 105 extending away from the longitudinal axis in a gingival direction between the first and second points, without extending on an occlusal side of the longitudinal axis, to define a gap along the longitudinal axis that is open in an occlusal direction to facilitate flossing.

(Ex. 1 at 7:10-28.)

41. The "archform" passage did not appear in the '126 application as filed. (*See generally* Ex. 4.)

42. The "archform" passage did not appear in any of the '696 patent's priority applications as filed.

43. The "archform" passage refers to an "archform 101" three times. (Ex. 1 at 7:10-28.)

44. The three references to an "archform 101" in the "archform" passage are the only instances (outside of the claims) in which the term "archform" appears in the specification of the issued '696 patent.

45. Although the "archform" passage refers to an "archform 101," the specification of the '696 patent in the preceding paragraph and elsewhere refers to an "archwire 101":

> To engage the **archwire 101** into an orthodontic bracket on a misaligned tooth, temporary deflections of the **archwire 101** may take place. The archwire can be made of any material, such as a shape memory alloy, beta-titanium, or stainless steels.

(Ex. 1 at 7:1-5 (emphasis added); *see also id*. at 6:40, 6:46-48, 6:59, 6:62, 6:64-66, 7:55, 7:57, 8:11, 8:59, 11:23 (referencing "archwire 101").)

46. The specification of the '696 patent uses the terms "archform" and "archwire" interchangeably.

47. All of the embodiments described in the '696 patent incorporate an archwire or a bracket for accommodating an archwire.

48. Figures 1A-1B the '696 patent reflect an embodiment of an archwire. (Ex. 1 at 4:41.)

49. Figures 2A-2B the '696 patent reflect an embodiment of an archwire. (Ex. 1 at 4:46.)

50. Figures 3A-11 of the '696 patent each reflect an embodiment that includes an archwire and/or an orthodontic bracket for accommodating an archwire.

51. Figures 3A-3H of the '696 patent reflect an embodiment of an orthodontic bracket into which "an archwire may be snap fitted." (Ex. 1 at 4:51-52.)

52. Figures 4A-4E of the '696 patent reflect an embodiment of an orthodontic bracket into which "an archwire may be snap fitted." (Ex. 1 at 5:3-5.)

53. Figures 5A-5E of the '696 patent reflect an embodiment of an orthodontic bracket into which "an archwire may be snap fitted." (Ex. 1 at 5:18-20.)

54. Figures 6A-6F of the '696 patent reflect an embodiment of an orthodontic bracket into which "an archwire may be snap fitted." (Ex. 1 at 5:33-35.)

55. Figures 7A-7F of the '696 patent reflect an embodiment of an orthodontic bracket into which "an archwire may be snap fitted." (Ex. 1 at 5:50-52.)

56. Figures 8A-8E of the '696 patent reflect an embodiment of an orthodontic bracket into which "an archwire may be snap fitted." (Ex. 1 at 5:66-6:1.)

57. Figures 9A-9B of the '696 patent reflect an embodiment of an orthodontic bracket and "archwire." (Ex. 1 at 6:14-19.)

58. Figures 10A-10C of the '696 patent reflect an embodiment of an orthodontic bracket and archwire." (Ex. 1 at 6:20-26.)

59. Figure 11 of the '696 patent reflects an embodiment of an orthodontic bracket and "archwire." (Ex. 1 at 6:27-28.)

60. The specification of the '696 patent does not describe an "archform" as anything other than an archwire.

61. The specification of the '696 patent does not support an "archform" as encompassing anything other than an archwire.

62. A person of ordinary skill in the art at the time of the alleged invention of the '696 patent would have understood the term "archform" as used in the '696 patent claims to refer to an archwire.

## **CLAIM FOR RELIEF**

### **(Declaratory Judgment of Noninfringement of the '696 Patent)**

63. Brius repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

64. An actual and justiciable controversy exists between Brius and Defendants concerning the noninfringement of the '696 patent.

65. InBrace purports to possess certain rights under the '696 patent by virtue of a license from USC.

66. InBrace has alleged, and continues to allege, that Brius' orthodontic appliances incorporating Independent Mover® technology infringe the '696 patent.

67. Brius denies that it has infringed, or infringes, any properly construed claim of the '696 patent.

68. Brius' orthodontic appliances incorporating Independent Mover® technology do not infringe any properly construed claim of the '696 patent at least because they do not include an archwire, and hence an "archform" as required by the claims of the '696 patent.

69. Brius is entitled to a judgment from this Court that Brius does not infringe, and has not infringed, any properly construed claim of the '696 patent.

70. Declaratory relief is necessary and appropriate so that Brius may ascertain its rights with respect to the '696 patent.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Brius hereby demands a jury trial on all issues and claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Brius respectfully requests the following relief:

A. A judgment declaring that Brius has not infringed, and does not infringe, any claim of the '696 patent;

B. An order permanently enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys, and all others acting for, on behalf of, or in active concert with any of them, from stating, implying, or suggesting that Brius has infringed, or infringes, the '696 patent;

C. An order finding that this is an exceptional case and awarding Brius its costs, expenses, disbursements, and reasonable attorneys' fees under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law; and

D. Such other relief, in law or in equity, to which Brius may show itself to be entitled or as this Court deems just and proper.

Dated: September 27, 2022     **PERKINS COIE LLP**

By: */s/ Lara J. Dueppen*

Hari Santhanam
(*pro hac vice* forthcoming)
HSanthanam@perkinscoie.com
PERKINS COIE LLP
110 North Wacker Drive
Suite 3400
Chicago, IL 60606-1511
Telephone: +1.312.324.8400
Facsimile: +1.312.324.9400

Nicole S. Dunham
(*pro hac vice* forthcoming)
NDunham@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000

Lori Gordon
(*pro hac vice* forthcoming)
LoriGordon@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street N.W.
Suite 800
Washington, DC 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

Lara J. Dueppen, SBN 259075
LDueppen@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: +1.310.788.9900
Facsimile: +1.310.788.3399

*Attorneys for Plaintiff*
*Brius Technologies, Inc.*